JUSTICE ALBIN delivered the opinion of the Court.
*966 **180 In Edwards v. Arizona, the United States Supreme Court held that when an accused invokes his right to have counsel present during a custodial interrogation, questioning must cease unless the accused initiates further communication or conversation. 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Edwards doctrine, which bars continuing an interrogation after a request for counsel, applies even if a different law enforcement agency seeks to question the accused about an unrelated crime, Arizona v. Roberson, 486 U.S. 675, 686-88, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), and even if the accused has consulted with an attorney, Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). The Edwards doctrine, however, does not apply "when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects." Maryland v. Shatzer, 559 U.S. 98, 109, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010) (emphasis added).
In this case, law enforcement officers arrested defendant Laurie Wint on a New Jersey murder charge and brought him to the Camden County Prosecutor's Office for questioning. Wint invoked his right to counsel after receiving Miranda [1] warnings, and the interrogation ceased. Immediately afterwards, two detectives from Pennsylvania investigating an unrelated murder in Bucks County entered the interrogation room to question Wint. After receiving his rights for the second time, Wint again requested the presence of counsel, ending the interrogation. Wint remained in continuous pre-indictment custody in Camden County when, six months later, he was transported to Bucks County. There, Pennsylvania detectives again administered Miranda warnings but did not provide counsel as Wint had earlier requested. This time, Wint waived his rights and allegedly incriminated himself in the New Jersey murder.
**181 The trial court denied Wint's motion to suppress his incriminating remarks believing that, for Edwards purposes, Wint reinitiated communication with the Pennsylvania detectives. The court also determined that the six-month lapse in time between interrogations satisfied the Shatzer"break-in-custody" requirement. With the admission of Wint's incriminating statements at trial, a jury convicted Wint of passion/provocation manslaughter and other related offenses.
The Appellate Division remanded to the trial court for reconsideration of the suppression issue. The panel held that the Pennsylvania detectives violated Edwards by attempting to interrogate Wint just minutes after he had requested counsel *967 from New Jersey law enforcement officers. The panel also found that Wint did not initiate the third interrogation in Bucks County. The panel, however, stopped short of suppressing Wint's incriminating statements. The panel determined that the trial court must engage in an attenuation analysis and also decide whether the six-month period between Wint's requests for counsel and the third round of questioning in Bucks County constituted a "break in custody" within the purview of Shatzer.
We now reverse. We agree with the Appellate Division that the Pennsylvania detectives violated Edwards by attempting to question Wint in Camden after his earlier request for counsel. We also agree that Wint did not initiate the interrogation that occurred in Bucks County. That third and last interrogation proceeded without the presence of counsel despite Wint's two previous requests for counsel. Here, the giving of repeated Miranda warnings did not cure the Edwards violation.
Wint remained in continuous pre-indictment custody for a period of six months before the questioning in Bucks County. Therefore, no "break in custody" occurred within the intendment of Shatzer. The Supreme Court set a bright line in Edwards and Shatzer: after a defendant requests counsel during a custodial interrogation, any statement secured during a subsequent custodial interrogation must be suppressed unless (1) counsel was provided **182 during the questioning, (2) defendant initiated the communication, or (3) a break in custody occurred. None of those exceptions apply here. We therefore part with the panel's decision to remand for an attenuation analysis and a break-in-custody analysis.
Accordingly, we reverse the judgment of the Appellate Division and remand for a new trial on the charge of passion/provocation manslaughter at which the incriminating statements made by Wint in Pennsylvania will be inadmissible.
I.
A.
On September 26, 2012, Wint was charged in a Camden County indictment with murder, N.J.S.A. 2C:11-3(a)(1) and (2) ; second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) ; second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b) ; fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a) ; and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b). Wint moved to suppress a statement he allegedly made to Pennsylvania detectives in Bucks County. He claimed that the Pennsylvania detectives violated Edwards by initiating an interrogation despite his earlier request for counsel in New Jersey.
A suppression hearing was conducted in the Camden County Superior Court, Law Division. At the hearing, the State elicited testimony from three witnesses: Investigator Lance Saunders of the Camden County Prosecutor's Office and two Pennsylvania detectives -- Detective John Bonargo of the Warminster Township Police Department and Detective Martin McDonough of the Bucks County District Attorney's Office. The testimony focused on three interrogations of Wint while he remained in pre-indictment custody.
Wint was charged on June 16, 2011 with the murder of Kevin Miller in the city of Camden and on July 29, 2011 with the murder of Tyrone Newman in Warminster Township, Pennsylvania. On **183 July 31, 2011, Camden police officers arrested Wint and transported him to the Camden County Prosecutor's Office for questioning.
Investigator Saunders began interrogating Wint while Detectives Bonargo and McDonough from Pennsylvania watched *968 from an adjacent room. Investigator Saunders advised Wint of his Miranda rights, including his right to the presence and appointment of counsel. Following a brief exchange, Wint responded, "I think I should call my lawyer" and "I really don't want to talk to anybody." All questioning then ceased.
After leaving the interrogation room, Investigator Saunders informed Detectives Bonargo and McDonough that Wint had invoked his right to counsel. Nevertheless, approximately three minutes later, the two Pennsylvania detectives entered the interrogation room to question Wint about their case. The detectives introduced themselves and, while acknowledging that Wint had chosen not to speak about the Camden case, asked whether he would be willing to speak about the Bucks County investigation. Wint responded he would if given a cigarette. However, after the detectives read him his Miranda rights, Wint requested the presence of counsel:
[McDonough]: Do you wish to speak to us without a lawyer being present?
[Wint]: I want him to sit here while we talk.
[McDonough]: I didn't hear. Do you wish to speak to us without a lawyer being present?
[Wint]: I want him to sit here while we talk.
[McDonough]: You want a lawyer here with us?
[Wint]: Yeah --
[McDonough]: Okay, so that, that won't happen today because we don't have a lawyer here with you --
[Wint]: Oh --
[McDonough]: But if you want one, that, that, that's fine.
[Wint]: Yeah.
[McDonough]: You're welcome to that.
[Wint]: Okay.
[McDonough]: But, um, if you wanted to talk to us today then, then your answer here would be no?
[Wint]: No. It would be no.
**184 [McDonough]: Or do you want to talk to us today?
[Wint]: I wanna talk to ya'll but I want a lawyer here present cause I don't, I don't --
[McDonough]: I got ya. I got ya. If that's, that, if that's your answer, that, that's your answer.
[Wint]: Yeah. So --
[McDonough]: So, you do not want to talk to us right now?
[Wint]: Without a lawyer.
In light of that dialogue, the Pennsylvania detectives stopped the questioning and exited the room. When Wint left the room, the detectives initiated an unrecorded verbal exchange with him. The detectives wished him good luck and stated, "[W]hen we get you back to Bucks County we can talk about this again." Wint responded, "[Y]eah, I'll talk to you when we get back to Bucks County."
Several months later, the Pennsylvania detectives returned to Camden to secure DNA samples from Wint, who was being held in the Camden County jail. In their encounter with Wint, the detectives informed him that they were taking steps to transfer him to Bucks County where they would like to talk to him. Wint reportedly responded, "I'll talk to you when I get back to Bucks [County]." During neither of those informal conversations -- prompted by the detectives -- did Wint indicate that he wished to speak without counsel present.
On January 18, 2012, six months after Wint had invoked his right to counsel in two separate interrogations, the Pennsylvania detectives transported Wint to the Warminster police station in Bucks County *969 for processing on the Pennsylvania murder charge. The booking process was audio recorded. Then, Wint was taken to a room with video- but not audio-recording capability. There, Detective McDonough advised Wint of his Miranda rights from the same form he used six months earlier. Wint signed the form and this time waived his rights.
The detectives then questioned Wint about the circumstances surrounding the death of Tyrone Newman in Warminster. Detective McDonough penned a fifteen-page statement summarizing **185 Wint's first-person account of the events. In explaining the reason for his presence in Warminster at the time of the Newman homicide, Wint allegedly said: "In June 2011 I committed a murder in Camden. About three weeks after the murder I saw my picture on TV. J-Rock and I decided we needed to leave from Camden and go and stay in Warminster." According to Detective McDonough, Wint reviewed the fifteen-page statement, made some corrections in his own handwriting, and signed the statement.
The trial court determined that Wint's admission that he committed a murder in Camden in June 2011 would be admissible at Wint's upcoming trial on the Camden County charges. The court found that Wint had knowingly, intelligently, and voluntarily waived his Miranda rights before making the incriminating statement. The court also concluded that, by saying "that he would speak to them when back in Pennsylvania," Wint reinitiated the conversation with the Pennsylvania detectives in Camden. In the court's view, that remark opened a pathway for the detectives to interrogate Wint six months later in the Warminster police station. Additionally, applying Shatzer, the court maintained that the six-month gap between defendant's invocation of his right to counsel in Camden and the interrogation in Warminster was "a substantial lapse in time to warrant his questioning about the Camden homicide."
B.
At Wint's jury trial, the State presented evidence of a deadly confrontation between Wint and Kevin Miller in Eutaw Park in Camden on the evening of June 8, 2011. The State argued that Wint purposely and without justification shot and killed Miller. In contrast, Wint claimed that he acted in self-defense after being jumped by Miller and his cohorts.
The State's testimony revealed that on June 8, Miller went to his girlfriend's home to celebrate her birthday only to learn that she was not there but in the company of Wint with whom she **186 formerly had an intimate relationship. Miller, angered by this revelation, drove around Camden with a friend, Clifton Bailey, in search of his girlfriend and Wint. Miller and Bailey eventually met up with a friend at Eutaw Park. Miller entered the park while his two friends remained at the park's entrance. When Bailey heard a gunshot, he raced inside the park and observed a person running from the scene. He found Miller seriously injured with a gunshot wound and took him to the hospital, where Miller died during surgery.
The State presented no eyewitnesses to the shooting. The State, however, placed on the stand John Briggs -- Wint's best friend -- who testified to the account that Wint gave him of the confrontation in the park. According to that account, Miller, Bailey, and other individuals attempted to jump Wint. One person from Miller's group reached for a gun at which point Wint pulled out a handgun he was carrying and fired in self-defense.
Wint testified that he learned that Miller was looking for him and that he believed that Miller and Bailey were members of the Bloods street gang. He *970 admitted that he was armed with a gun for his self-protection although he had no permit to carry the weapon. He stated that Miller and three others accosted him in Eutaw Park. Three members of the group started punching him, and he fell to the ground. Then, Bailey pulled out a gun as another person from the group reached for a second gun. At that point, Wint drew his gun and, without aiming, pulled the trigger. Wint claimed that, at the time, he did not know that he struck anyone, asserting, "I wasn't trying to kill anyone. I was just trying to save myself." Wint then ran from the park and discarded the weapon. He fled to Pennsylvania several weeks later, in part because he feared retaliation by the Bloods gang.
To preemptively discredit that version of the shooting, the State earlier presented both the medical examiner's testimony that the deadly shot was fired at a downward angle and Detective McDonough's testimony that Wint admitted at the Warminster police station that he had "committed a murder" in Camden. Concerning **187 the alleged admission, Wint explained, "I told [Detective McDonough] I did a shooting in Camden," and that the detective characterized it as a murder.
The jury acquitted Wint of murder but found him guilty of the lesser-included offense of passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), and the other charged offenses. The court sentenced Wint to an extended term of fourteen years on the manslaughter conviction, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2 ; a consecutive term of eight years with a five-year period of parole disqualification on the certain-persons conviction; and a concurrent one-year term on the resisting-arrest conviction. The other firearm possessory offenses were merged. The court ran the aggregate twenty-two year term, subject to a sixteen-year and eleven-month period of parole ineligibility, consecutive to the sentence Wint was serving in Pennsylvania.
C.
In an unpublished opinion, the Appellate Division primarily focused on Wint's argument that the trial court's admission of Wint's incriminating statement to the Pennsylvania detectives in Warminster violated his constitutional rights as articulated in the Edwards line of cases. In addressing that issue, the panel made some preliminary findings: (1) "the Pennsylvania detectives had no right to initiate any interrogation of [Wint], only minutes after he had invoked his right to counsel in the same interrogation room to the Camden detectives"; (2) their attempted interrogation of Wint in Camden was constitutionally prohibited in the absence of summoning counsel for Wint; and (3) the detectives -- not Wint -- initiated the post-interrogation discussions in Camden and the later interrogation in the Warminster police station.[2]
**188 As the panel observed, " Shatzer recognized an important doctrinal distinction between the interrogation of persons who are confined due to past convictions, as opposed to persons who are pretrial detainees," citing Shatzer, 559 U.S. at 106-08, 130 S.Ct. 1213. The panel acknowledged that, under Shatzer, a break in custody after an interrogation means one thing for convicted prison inmates and another thing for pretrial detainees. For interrogated inmates, a break in custody is a release back to the general prison population, where "they return to their accustomed surroundings and daily routine,"
*971 whereas for interrogated pretrial detainees, a break in custody is a release from pretrial custody and a return to a normal life in the free world, quoting Shatzer, 559 U.S. at 113, 130 S.Ct. 1213.
Despite the differences that Shatzer delineated between prison inmates and pretrial detainees, the panel examined whether, for break-in-custody purposes, the circumstances of an interrogated pretrial detainee who remains in custody for six months in a county jail is any different from that of an interrogated convicted inmate who is released back into the general prison population. The panel questioned whether the ability of the Pennsylvania authorities to place coercive pressures or exert leverage on Wint, who was confined in a Camden jail, was any different than if he were a convicted inmate serving time in prison. Thus, the panel concluded that the record was "incomplete and inconclusive to enable the Shatzer'break-in-custody' analysis to be resolved definitively."
The panel also determined that the record was inadequate to analyze whether the six-month gap in time before the Warminster interrogation dissipated the taint of the improper attempted interrogation in Camden at which defendant invoked his right to counsel. The panel looked to Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) ; State v. Maltese, 222 N.J. 525, 120 A.3d 197 (2015) ; and State v. Hartley, 103 N.J. 252, 511 A.2d 80 (1986), cases where courts conducted an attenuation analysis after the defendants invoked their right to remain silent, rather **189 than the Edwards line of cases where defendants invoked their right to an attorney. The panel directed that, on remand, the trial court conduct an attenuation analysis and examine a non-exhaustive list of factors: the time between the interviews; the place of the interviews; whether adequate Miranda warnings were given; the effect of any admissions made at the first interrogation on the second interrogation; and the "purpose and flagrancy" of the police misconduct, citing Brown v. Illinois, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The panel did "not subscribe to the extreme view that [Wint]'s invocation of his Fifth Amendment rights ... inexorably barred all law enforcement agents from any jurisdiction from attempting to interview him about the crimes during his lengthy period of pretrial detention."
The panel instructed the trial court to decide, after conducting a break-in-custody and attenuation analysis, whether to suppress or admit Wint's incriminating statement. The panel stated that if the court orders suppression then "[Wint]'s conviction must be vacated and a new trial shall proceed, at which the statement will be excluded." The panel did not elaborate on whether any potential new trial applied just to the manslaughter conviction or also to the resisting-arrest and gun-possession convictions.
Last, the panel rejected Wint's contentions that the prosecutor denied him a fair trial by arguing in summation that "he should have waited for the police at the scene of the shooting if indeed his conduct was innocuous" and that the trial court should have declared a mistrial after removing and replacing two deliberating jurors.
We granted Wint's petition for certification, 231 N.J. 564, 177 A.3d 132 (2017), and the State's cross-petition, 231 N.J. 546, 177 A.3d 122 (2017).[3] We also granted the motions *972 of the American **190 Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.
II.
A.
Wint contends that the Appellate Division failed to follow the commands of Edwards and Shatzer by remanding to the trial court for a break-in-custody and attenuation analysis. Wint asserts that he remained in continuous, uninterrupted pre-indictment custody from the time he repeatedly invoked his right to counsel during separate interrogations by New Jersey and Pennsylvania law enforcement authorities until he was questioned later in Pennsylvania without counsel. Given the absence of a break in custody, Wint submits, Edwards barred his subsequent interrogation without counsel because he did not initiate a discussion with the Pennsylvania detectives. He reasons that the amount of time a suspect spends in pre-indictment custody does not constitute a break in custody because the longer the period awaiting indictment, the greater the coercive pressure to cooperate without the counsel he earlier requested, citing Minnick, 498 U.S. at 153, 111 S.Ct. 486, and Roberson, 486 U.S. at 686, 108 S.Ct. 2093.
Wint emphasizes that in erroneously requiring an attenuation analysis, the Appellate Division followed the line of Miranda cases involving a suspect's invocation of his right to remain silent, such as Mosley, Maltese, and Hartley. He notes that in the Edwards line of cases involving a suspect's invocation of his right to counsel, the Supreme Court suppresses statements elicited in the absence of counsel; no attenuation analysis is conducted.
Amici ACLU and ACDL advance many of the same arguments as Wint. The ACLU contends that Shatzer's break-in-custody rule **191 applies to interrogated convicted inmates who are returned to the general prison population for fourteen days or longer but not to interrogated suspects awaiting indictment who are returned to pretrial detention rather than released into the community. According to the ACLU, Shatzer made very clear that pretrial detention is different from post-conviction incarceration in an Edwards context. The ACDL argues that law enforcement would be given a perverse incentive if the longer a pre-indictment detainee is held in jail after invoking his right to counsel, the easier it becomes to continue to question him without counsel. Both the ACLU and ACDL point out New Jersey's strong and independent commitment to the privilege against self-incrimination, which is codified in N.J.S.A. 2A:84A-19 and N.J.R.E. 503, as well as our state-law jurisprudence.
B.
The State acknowledges that a defendant who is in pre-indictment custody and has invoked his right to counsel cannot be reinterrogated until an attorney is provided unless the defendant reinitiates contact with the police or a break in custody of at least fourteen days occurs. The State, however, asserts that "[Wint] only conditionally invoked his right to counsel initially." According to the State, Wint's verbal exchanges with the Pennsylvania detectives indicated that Wint wanted an attorney present if the detectives intended to take a statement from him in Camden but that "he would freely speak with [them] once he was transported back to Pennsylvania." The State takes the position that Wint initiated contact with the Pennsylvania detectives because "on two occasions over the course of three months, [he] told [those] detectives he would talk with them when he was brought to Pennsylvania."
The State, moreover, maintains that "a six-month break in Miranda custody" occurred *973 between the attempted interrogations in Camden, where defendant invoked his right to counsel, and the interrogation in Warminster, where defendant waived his rights **192 and gave a voluntary statement. The State rejects the proposition that "the Shatzer break-in-custody analysis applies only to prisoners who are serving a sentence upon conviction, and never to pre-trial detainees."
In the State's view, the question posed by Shatzer is not whether Wint had the opportunity "to return to the normalcy of his pre-arrest life outside of prison," but rather whether Wint's return to jail "following the initial interrogation represented the same sort of 'return to normalcy' experienced by Shatzer after his initial interrogation" and return to the general prison population. The State answers that question by stressing that Wint was simply subject to the ordinary restrictions of daily life in the county jail during his six-month detention and not to "the sort of coercive pressures inherent in 'interrogative custody' that Miranda and Edwards are meant to deflect," citing Shatzer, 559 U.S. at 113 n.8, 130 S.Ct. 1213. Accordingly, the State contends that if Shatzer's return to the general prison population after his interrogation constituted a break in custody, so too does Wint's return to the county jail population.
The State therefore asks this Court to reverse the Appellate Division's remand for a break-in-custody and attenuation analysis and affirm Wint's convictions.
III.
A.
One of the fundamental guarantees of the United States Constitution and our state law is that no person can be compelled to be a witness against himself in a criminal case. See U.S. Const. amend. V ("No person ... shall be compelled in any criminal case to be a witness against himself ....");[4] N.J.S.A. 2A:84A-19 ("[E]very **193 natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate ...."); N.J.R.E. 503 (same as N.J.S.A. 2A:84A-19 ).
In the landmark case of Miranda v. Arizona, the United States Supreme Court imposed safeguards to enable an individual to exercise meaningfully the right against self-incrimination when interrogated while in police custody. 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To counteract the inherent psychological pressures that might compel a person subject to a custodial interrogation "to speak where he would not otherwise do so freely," the Court mandated that the police advise a suspect of certain basic rights. Id. at 467, 479, 86 S.Ct. 1602. Before questioning a suspect during a custodial interrogation, the police must warn him that
he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
[ Id. at 479, 86 S.Ct. 1602 (emphasis added).]
Miranda further instructed that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present."
*974 Id. at 474, 86 S.Ct. 1602 (emphasis added). An individual who requests counsel must be given "an opportunity to confer with the attorney and to have him present during any subsequent questioning." Ibid. (emphasis added). If the State fails to honor a defendant's exercise of the right to counsel, including the right to appointed counsel, "no evidence obtained as a result of interrogation can be used against him." Id. at 479, 86 S.Ct. 1602.
In Edwards v. Arizona, the Supreme Court took additional steps to ensure that the right to counsel guaranteed in Miranda would not be circumvented. 451 U.S. 477, 101 S.Ct. 1880. Edwards held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been **194 advised of his rights." Id. at 484, 101 S.Ct. 1880. The Court further held that an accused, who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85, 101 S.Ct. 1880.
In that case, the police arrested Edwards on charges of murder, robbery, and burglary. Id. at 478, 101 S.Ct. 1880. After initially waiving his Miranda rights and speaking to the police at the stationhouse, Edwards said, "I want an attorney before making a deal," at which point the questioning ceased. Id. at 479, 101 S.Ct. 1880. The next morning, two detectives visited Edwards in the county jail and advised him again of his Miranda rights, including his right to counsel. Ibid. That time, Edwards waived his rights and confessed. Ibid. The Supreme Court suppressed the confession because Edwards requested counsel at the first interrogation and did not initiate the meeting the next day with the detectives, and because the detectives questioned him without making counsel available to him at the second interrogation. Id. at 487, 101 S.Ct. 1880.
In Arizona v. Roberson, the Supreme Court elaborated on Edwards and made clear that once a suspect requests the presence of counsel during an interrogation relating to one investigation, neither the same nor another law enforcement agency may initiate a second interrogation, even one relating to a different investigation, without providing the suspect with the counsel he earlier requested. 486 U.S. at 677-78, 687-88, 108 S.Ct. 2093. In Roberson, the defendant was arrested for burglary, advised of his Miranda rights, and told the arresting officer that he "wanted a lawyer before answering any questions." Id. at 678, 108 S.Ct. 2093. Three days later, a different officer, unaware that the defendant earlier requested the assistance of counsel, interrogated the defendant about another burglary. Ibid. That time, despite being informed **195 that he had the right to counsel, the defendant made an incriminating statement. Ibid.
The Supreme Court affirmed the suppression of the statement. Id. at 688, 108 S.Ct. 2093. The Court explained its rationale: "[T]he presumption raised by a suspect's request for counsel -- that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance -- does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." Id. at 683, 108 S.Ct. 2093. Moreover, when the suspect requests the presence of an attorney to deal with the inherent pressures of his custodial status, "there is no reason to assume that a suspect's state of mind is in any way investigation-specific." Id. at 684, 108 S.Ct. 2093. The obligation *975 is on the law enforcement officers seeking to reinterrogate a suspect to inquire whether he had earlier invoked the right to counsel. Id. at 687-88, 108 S.Ct. 2093. Although nothing prevents a law enforcement agency from advising a suspect that he is the subject of separate investigations, if the suspect has earlier requested the assistance of counsel and not initiated discussions with the authorities, he "can determine how to deal with the separate investigations with counsel's advice." Id. at 687, 108 S.Ct. 2093.
The Court in Roberson distinguished the bright line barring a subsequent interrogation in a case where the suspect has invoked his right to counsel from a case where the suspect has merely decided to cut off questioning, as in Mosley, 423 U.S. at 103-04, 96 S.Ct. 321. Roberson, 486 U.S. at 682-83, 108 S.Ct. 2093. The request for counsel, unlike the decision to remain silent, "raise[s] the presumption that [the suspect] is unable to proceed without a lawyer's advice." Id. at 683, 108 S.Ct. 2093. Last, the Court reaffirmed the benefits of the "clear and unequivocal" guidelines provided by the Edwards rule: The police and prosecutors are given specific instructions on how to conduct custodial interrogations and know that the failure to follow those instructions will **196 result in suppression of otherwise "trustworthy and highly probative evidence." Id. at 681-82, 108 S.Ct. 2093.
Minnick v. Mississippi further fortified Miranda's and Edwards's focus on the importance of the actual presence of counsel at a custodial interrogation when a suspect invokes his right to counsel. 498 U.S. at 152-53, 111 S.Ct. 486. The Court held "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Id. at 153, 111 S.Ct. 486. The Court stressed that the presence of counsel is not a mere procedural formality but a safeguard to ensure that the "police interrogation conform[s] to the dictates of the [Fifth Amendment]" and "that statements made in the government-established atmosphere are not the product of compulsion." Id. at 152, 111 S.Ct. 486 (second alteration in original) (quoting Miranda, 384 U.S. at 466, 86 S.Ct. 1602 ). Thus, the Court "decline[d] to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes." Id. at 154, 111 S.Ct. 486.
B.
In Maryland v. Shatzer, the Supreme Court announced a break-in-custody exception to the Edwards rule, which presumes that, after a defendant invokes his right to counsel, any statement taken during a subsequent custodial interrogation without counsel is not voluntary. 559 U.S. at 104-05, 130 S.Ct. 1213. What constitutes a break in custody is hotly debated between the parties in the present case. The United States Supreme Court has never explicitly placed any temporal limits on the Edwards rule when a statement is the product of a police-initiated interrogation of a defendant who earlier invoked his right to counsel and who remains in continuous pre-indictment, pretrial custody. The question is whether, in the circumstances of the present case, Shatzer opened the door to police-initiated questioning of a pre-indictment, pretrial detainee in the absence of counsel.
**197 In Shatzer, a township police detective investigating allegations that Shatzer had sexually abused his son sought to interview Shatzer, who was imprisoned in a state correctional institution on an unrelated offense. Id. at 100-01, 130 S.Ct. 1213. The detective read Shatzer his Miranda rights, and after a short colloquy, Shatzer *976 declined to speak without an attorney, ending the interview. Id. at 101, 130 S.Ct. 1213. Two-and-a-half years later, another detective from the same police department, armed with more specific information, visited a correctional institution to interview Shatzer. Ibid. The detective explained the allegations to Shatzer, read him his Miranda rights, and secured a written waiver of those rights. Ibid. During the interview, Shatzer made an incriminating statement. Id. at 101-02, 130 S.Ct. 1213. At no point did Shatzer request to speak with an attorney. Id. at 102, 130 S.Ct. 1213. Five days later, the interrogating detective and another detective returned to the correctional institution. Ibid. Shatzer again waived his Miranda rights and made a further inculpatory statement, after which he requested counsel and the interrogation ceased. Ibid.
The Supreme Court held that Edwards did not mandate suppression of Shatzer's incriminating statements because, after his first interrogation, Shatzer experienced a break in Miranda custody by returning to the general prison population and because the second round of interrogations occurred more than two-and-a-half years later. Id. at 114, 116-17, 130 S.Ct. 1213. The Court maintained that a break in custody means different things for pretrial detainees and prison inmates. Id. at 106-07, 112-14, 130 S.Ct. 1213.
In the case of a suspect who is "arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated[,] ... he remains cut off from his normal life and companions, 'thrust into' and isolated in an 'unfamiliar,' 'police-dominated atmosphere,' where his captors 'appear to control [his] fate.' " Id. at 106, 130 S.Ct. 1213 (third alteration in original) (first quoting Miranda, 384 U.S. at 456-57, 86 S.Ct. 1602 ; then quoting **198 Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ). That was the scenario faced by the defendants in Edwards, Roberson, and Minnick because none of those defendants "regained a sense of control or normalcy after they were initially taken into custody for the crime under investigation." Id. at 106-07, 130 S.Ct. 1213. The "continued detention [of those defendants] rested with those controlling their interrogation, and [they] confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive." Id. at 114, 130 S.Ct. 1213 (emphasis added).
The Shatzer Court explained, however, that when "a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced." Id. at 107, 130 S.Ct. 1213 (emphasis added). In that situation, the suspect "has no longer been isolated. He has likely been able to seek advice from an attorney, family members, and friends. And he knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt; and that investigative custody does not last indefinitely." Id. at 107-08, 130 S.Ct. 1213 (footnote omitted). The Court concluded that "an extension of Edwards is not justified ... when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects." Id. at 109, 130 S.Ct. 1213. In that circumstance, the fresh administration of Miranda warnings when the suspect is reinterrogated is "deemed sufficient" to protect his constitutional right to counsel. Ibid.
The Court applied this paradigm to Shatzer, a convicted inmate, who, after his initial interrogation at which he invoked his right to counsel, was returned to the *977 general prison population where he remained for two-and-a-half years before detectives reinterrogated him. Id. at 112, 130 S.Ct. 1213. The Court ultimately determined that Shatzer's return to the general prison population qualified as a break in custody. Id. at 117, 130 S.Ct. 1213. It reached that conclusion because, in its view, "lawful imprisonment imposed **199 upon conviction of a crime does not create the coercive pressures identified in Miranda." Id. at 113, 130 S.Ct. 1213 (emphasis added). The Court gave the following rationale for considering a convicted inmate's return to the general prison population a break in custody:
Interrogated suspects who have previously been convicted of crime live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine -- they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the Miranda paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.
Their detention, moreover, is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing.
[ Id. at 113, 130 S.Ct. 1213.]
The Court adopted a bright-line rule for determining when a break in custody is of adequate length to overcome the Edwards presumption of involuntariness attaching to a police-initiated reinterrogation of a suspect who earlier has requested counsel. Id. at 109-10, 130 S.Ct. 1213. A break in custody of fourteen days, the Court held, is sufficient "time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." Id. at 110, 130 S.Ct. 1213. Because Shatzer's break in custody lasted two-and-a-half years, the incriminating statements made at his reinterrogation were admissible. Id. at 110, 117, 130 S.Ct. 1213.
Shatzer did not suggest that, for break-in-custody purposes, a convicted inmate returning to the general prison population is comparable to a pre-indictment, pretrial detainee returning to his jail cell. See Howes v. Fields, 565 U.S. 499, 510, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012) (noting that Shatzer"held that a break in custody may occur while a suspect is serving a term in prison"). Indeed, in discussing the coercive effects of custodial interrogation in the Miranda context, the Court in Howes took pains to distinguish between convicted inmates on the one hand and pretrial detainees on the other. Id. at 511-12, 132 S.Ct. 1181 ("[A] prisoner, unlike a person who has not been convicted and sentenced, knows **200 that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." (citing Shatzer, 559 U.S. at 103-14, 130 S.Ct. 1213 ) ).
Some courts, but not all, have concluded that Shatzer expressed the "view that sentenced prisoners are distinct from pretrial detainees for purposes of [the Edwards ] presumption of involuntariness." United States v. Coles, 264 F.Supp.3d 667, 683 (M.D. Pa. 2017) (holding that pretrial detainee "did not experience a break in Miranda custody when he was returned to pretrial detention for 35 days between interrogations"); Trotter v. United States, 121 A.3d 40, 48-49 (D.C. 2015) (holding that for Shatzer purposes five-month period between interrogations did not constitute break in custody for pretrial detainee).
*978 But see Commonwealth v. Champney, 161 A.3d 265, 284 (Pa. Super. Ct. 2017) (holding that "the nearly five-month break between [pretrial detainee's] invocation of his right to counsel and the prison interrogation removed the Edwards presumption of involuntariness").
IV.
We now apply the legal principles developed in the Edwards line of cases to the facts before us.
Wint faced separate murder charges in Camden County and Bucks County when police officers arrested him and took him to the Camden County Prosecutor's Office for questioning. Wint was placed in an interrogation room, where an investigator from the Camden County Prosecutor's Office proceeded to interview him as two Pennsylvania detectives watched from an adjacent room. After the investigator advised Wint of his Miranda rights, Wint told him, "I think I should call my lawyer" and "I really don't want to talk to anybody." (emphasis added). The investigator then stopped the interview.
Despite having observed Wint invoke his right to counsel and having been told about that invocation, the two Pennsylvania detectives entered the room to question Wint about the Pennsylvania **201 murder charge. That attempt by the Pennsylvania detectives to interrogate Wint about their investigation, approximately three minutes after they knew he had unequivocally requested counsel, was a clear violation of Edwards. See Roberson, 486 U.S. at 677-78, 687-88, 108 S.Ct. 2093 (stating that when defendant requests counsel during interrogation by one law enforcement agency, another law enforcement agency may not initiate second interrogation relating to another investigation); see also McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("The Edwards rule ... is not offense specific: Once a suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." (citing Roberson, 486 U.S. at 675, 108 S.Ct. 2093 ) ). At that point, our constitutional jurisprudence required the detectives, as a precondition to any interrogation, to provide Wint with the attorney he requested. See Roberson, 486 U.S. at 687, 108 S.Ct. 2093 ; see also State v. Wright, 97 N.J. 113, 126, 477 A.2d 1265 (1984).
After the Pennsylvania detectives advised Wint of his right to the presence of a lawyer, Wint responded, "I want him to sit here while we talk." Wint repeated five more times that he did not want to answer questions without a lawyer, and then the detectives ceased the interrogation. With two sets of interrogating officers, Wint made clear that he wanted to avail himself of his constitutional right to counsel.
The record does not support the trial court's finding that Wint initiated a conversation with the Pennsylvania detectives in which Wint agreed to speak with them at some later time without counsel. Like the Appellate Division, we cannot defer to factual findings that are not "supported by sufficient credible evidence in the record" and therefore are clearly mistaken. State v. Elders, 192 N.J. 224, 243-44, 927 A.2d 1250 (2007) (citation omitted); see also State v. S.S., 229 N.J. 360, 381, 162 A.3d 1058 (2017).
**202 Detective McDonough's testimony at the motion hearing left no doubt that the Pennsylvania detectives initiated a conversation with Wint as he left the interrogation room and stood in the hallway of the Camden County Prosecutor's Office. Undeterred, the detectives initiated a new colloquy by saying, "[W]hen we get back to Bucks County we can talk about this again." To that prompting, defendant responded, *979 mimicking their words, "Yeah, I'll talk to you when we get back to Bucks County." A similar exchange occurred three months later when the detectives visited Wint in the Camden County jail to secure a DNA sample. Again, according to Detective McDonough, the detectives initiated the conversation by saying to Wint they would talk with him after his transfer to Pennsylvania -- "when he got back to Bucks [County]" -- and Wint responded as he had earlier, "Yeah, I'll talk to you when I get back to Bucks." Based on the undisputed evidence before us, Wint did not "initiate[ ] further communication, exchanges, or conversations with the police" to open the door to an interrogation without counsel. Edwards, 451 U.S. at 485, 101 S.Ct. 1880 ; see also State v. Alston, 204 N.J. 614, 620, 10 A.3d 880 (2011) (stating suspect must "initiate[ ] further communication sufficient to waive the right to counsel" (citing Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880 ) ).
Wint remained in continuous pre-indictment, pretrial custody in the Camden County jail when he was transported to the Warminster police station in Pennsylvania where the same detectives -- who had interrogated him six months earlier when he had requested the presence of counsel -- interrogated him again without providing him with counsel. The detectives read Wint his Miranda rights, which this time he waived, and Wint made an incriminating admission -- one that he disputed at trial -- concerning the Camden County murder charge.
We conclude that Wint did not experience a break in custody within the intendment of Shatzer before he was interrogated without counsel in Pennsylvania, and therefore the Edwards presumption of involuntariness applies to the admission Wint made to **203 the detectives. For break-in-custody purposes, Shatzer distinguished the very different worlds and circumstances of a pretrial detainee and a convicted inmate.
A pre-indictment, pretrial detainee's status is conditional and of limited duration. Changed circumstances may result in his release from pretrial detention. Under the New Jersey Criminal Justice Reform Act, "[t]he eligible defendant shall not remain detained in jail for more than 90 days, not counting excludable time for reasonable delays ... , prior to the return of an indictment." N.J.S.A. 2A:162-22(a)(1)(a). As such, extended pre-indictment detainment should be the exception, not the rule. Indictment triggers the onset of the formal adversarial judicial process, which in turn entitles a defendant to the assistance of counsel under the Sixth Amendment, Kirby v. Illinois, 406 U.S. 682, 688-89, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), as well as Article I, Paragraph 10 of the New Jersey Constitution, State v. Sanchez, 129 N.J. 261, 274-78, 609 A.2d 400 (1992). "[A]fter the return of an indictment, prosecutors and their representatives should not initiate conversations with an uncounselled defendant." Id. at 277, 609 A.2d 400.[5] If returning a pre-indictment detainee to the county jail after he has requested counsel during an interrogation counted as a break in custody, then the prosecutor might have a perverse incentive to delay an indictment's return to allow repeated attempts to interrogate a defendant every couple of weeks.
During the pre-indictment period, a pretrial detainee remains in custody while his criminal charges are under investigation, and his interrogators appear to control his fate, including the final charges he might *980 face and the sentence he might receive if convicted. See Shatzer, 559 U.S. at 106, 114, 130 S.Ct. 1213. During this time, "he remains cut off from his normal life and companions, [and] 'thrust
into' and isolated in an 'unfamiliar,' 'police-dominated atmosphere.' " Id. at 106, 130 S.Ct. 1213 (quoting Miranda, 384 U.S. at 456-57, 86 S.Ct. 1602 ). When a pretrial detainee is released into the free world he experiences a break in custody. Id. at 110, 130 S.Ct. 1213. He is no longer "isolated," he returns "to his normal life for some time before the later attempted interrogation," he is "able to seek advice from an attorney, family members, and friends," and "he knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt." Id. at 107-08, 130 S.Ct. 1213 ; see also State v. Wessells, 209 N.J. 395, 413, 37 A.3d 1122 (2012) (holding that nine days in community was insufficient break in custody to dissipate coercive taint of initial interrogation).
As Shatzer explained, convicted inmates stand in a very different position because their world is prison. After they are interrogated, "they are released back into the general prison population," where "they return to their accustomed surroundings and daily routine," and where "they regain the degree of control they had over their lives prior to the interrogation." 559 U.S. at 113, 130 S.Ct. 1213. Unlike pretrial detainees, "[t]heir detention ... is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing." Ibid.
We now hold that pre-indictment, pretrial detainment does not qualify as a break in custody under Shatzer. Wint's return to his pre-indictment, pretrial custody in the Camden County jail after two interrogations during which he invoked his right to counsel was not a return to normalcy. As the United States Supreme Court observed in Minnick, "the coercive pressures that accompany custody ... may increase as custody is prolonged." 498 U.S. at 153, 111 S.Ct. 486. In the Camden County Prosecutor's Office, in two separate investigations, Wint requested the presence of counsel not less than six times. As Justice Stevens observed in his concurring opinion in Shatzer, "[w]hen police have
not honored an earlier commitment to provide a detainee with a lawyer, the detainee likely will 'understan[d] his (expressed) wishes to have been ignored' and 'may well see further objection as futile and confession (true or not) as the only way to end his interrogation.' " 559 U.S. at 121-22, 130 S.Ct. 1213 (second alteration in original) (quoting Davis v. United States, 512 U.S. 452, 472-73, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (Souter, J., concurring in the judgment) ). Had the Pennsylvania detectives provided Wint with the presence of counsel earlier promised, they could have attempted a new round of interrogation.
Providing Wint with the counsel he requested also would have ensured the integrity of the interrogation process. See Minnick, 498 U.S. at 152, 111 S.Ct. 486 (citing Miranda, 384 U.S. at 466, 86 S.Ct. 1602 ). The presence of a lawyer may have foreclosed a dispute over the precise words spoken by Wint -- whether he said he "committed a murder" or "did a shooting." A lawyer may have insisted on the detective audio recording rather than handwriting Wint's responses or may have corrected any error in the detective's transcription. The benefit of counsel is not only to advise the suspect, but also to help guarantee that the "police interrogation conform[s] to the dictates of the [Fifth Amendment]." Ibid. (second alteration in original) (quoting Miranda, 384 U.S. at 466, 86 S.Ct. 1602 ).
*981 Because the detectives initiated the interrogation and did not provide counsel to Wint, Edwards requires suppression of the incriminating statement made to the detectives concerning the shooting in Camden. We further hold that the admission of Wint's statement -- "I committed a murder in Camden" -- was not harmless error and was clearly capable of causing an unjust result. See R. 2:10-2. "The test for determining whether an error is harmless 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " Sanchez, 129 N.J. at 278, 609 A.2d 400 (quoting Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ).
The State charged defendant with committing murder by purposely or knowingly shooting to death Kevin Miller. See N.J.S.A. 2C:11-3(a)(1) and (2) (defining murder). No eyewitness testified to the confrontation that led to Miller's death other than Wint. Wint claimed that he acted in self-defense, relying on the account he gave to his friend several days after the shooting and on his own testimony of how he was "jumped" by Miller and his cohorts. In summation, the prosecutor stated that Wint's admission was "very important," and repeatedly argued that Wint's words offered both "a glimpse into his mind and ... a window into his soul" and a version of "what really happened." Wint's conviction of passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), did not mitigate the damage inflicted on Wint's self-defense claim. Because the erroneous admission of Wint's statement was not harmless, Wint is entitled to a new trial in the homicide case. Because the erroneous admission of the statement was not relevant to the certain-persons weapons possession and resisting-arrest convictions, those convictions stand.
In light of our determination that, as a matter of law, no break in custody occurred, the Appellate Division erred in remanding to the trial court on that issue. Additionally, the Appellate Division erred in finding that an Edwards violation is subject to an attenuation analysis. The case law does not support that proposition. See Roberson, 486 U.S. at 681-82, 108 S.Ct. 2093 ; see also Minnick, 498 U.S. at 159, 111 S.Ct. 486. Last, we need not address in this case whether the Edwards presumption of involuntariness is "eternal" for pretrial detainees, who may spend years confined awaiting trial in the custody of a county jail.
In summary, at a new trial, the State may not admit as substantive evidence Wint's statement to the Pennsylvania detectives. See McNeil, 501 U.S. at 177, 111 S.Ct. 2204 (stating that where police "initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial").
V.
We next dispose of two remaining issues.
Because Wint must be retried on the charge of passion/provocation manslaughter, we need not address whether the prosecutor crossed the line in summation by arguing that the jury draw an adverse inference from Wint's flight. Although flight is in the case and is fair argument, we caution the prosecutor against using language that treads on Wint's right against self-incrimination, such as stating, "Does he stay and talk to the police?" See N.J.S.A. 2A:84A-19 ("[E]very natural person has a right to refuse to disclose ... to a police officer or other official any matter *982 that will incriminate him ...."); N.J.R.E. 503 (same).
Last, we reject Wint's argument that the trial court improperly dismissed two deliberating jurors and replaced them with alternates. One juror evidently knew a family member of the victim in the courtroom and mentioned that fact to other jurors. The juror who made the observation and another juror to whom she related information expressed an inability to remain impartial. After conducting a voir dire of all the jurors, the court replaced those two compromised jurors with alternates. We agree with the Appellate Division that the trial court did not abuse its discretion in denying Wint's motion for a mistrial.
VI.
For the reasons expressed, we reverse the judgment of the Appellate Division and remand for a new trial on passion/provocation manslaughter.[6] We affirm the judgments on the certain-persons weapons possession and resisting-arrest convictions.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, and TIMPONE join in JUSTICE ALBIN's opinion.
JUSTICES FERNANDEZ-VINA and SOLOMON did not participate.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The panel rejected "the trial court's mistaken finding" that Wint reinitiated discussions with the Pennsylvania detectives.

We granted certification on three issues, only one of which we discuss at length in this opinion. The last two issues, which concern the prosecutor's summation and the court's replacement of two jurors, are discussed summarily at the conclusion of the opinion. We do not present the parties' arguments on those issues.

The Fifth Amendment right against self-incrimination has been made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

Sanchez also cites as authority for this proposition RPC 4.2, which generally bars a lawyer from communicating with a person the lawyer knows is represented by counsel. 129 N.J. at 277, 609 A.2d 400 (citing RPC 4.2 (1992) (amended 2003) ).

We note that the conviction for possession of a firearm for an unlawful purpose was merged into the passion/provocation manslaughter conviction and therefore, on retrial, may be revived.