SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

### State v. Abayuba Rivas (A-15-21) (086051)

**Argued March 14, 2022 -- Decided June 22, 2022**

**ALBIN, J., writing for a unanimous Court.**

When a suspect invokes the right to counsel during a custodial interrogation, questioning must cease unless the accused initiates further communication or conversation, counsel is made available, or a sufficient break in custody occurs. The issue in this case is whether defendant Abayuba Rivas freely initiated further communications with the police immediately on the heels of a nearly six-hour unlawful interrogation that led to a full confession.

At 10:00 a.m. on February 24, 2014, Rivas went to the Elizabeth Police Department and reported that his wife Karla Villagra Garzon was missing -- that she never returned from a trip to the pharmacy the previous evening. Over the next several days, Rivas gave statements to the police to assist in the missing-persons investigation. At first, he continued to insist that he remained home on the evening that Karla went missing -- until he was shown surveillance footage that showed the truck registered to him traveling on the streets of Elizabeth in the early morning hours of February 24. Then, Rivas stated that he had left his two-year-old daughter home alone while he drove around looking for Karla, who, he thought, may have had a liaison with someone. At the end of the questioning, Rivas was arrested and incarcerated for child endangerment and providing false information to the police.

On March 17, after a suicide attempt while held in jail, Rivas was taken to a local hospital. That evening, detectives visited Rivas in the hospital. After reading Rivas his Miranda rights, the detectives questioned him, and Rivas soon departed from his earlier account. According to Rivas, he and Karla had gone to the pharmacy together, leaving their daughter alone, and were carjacked by several men. Rivas claimed that under coercion, he drove his vehicle until ordered to pull to the side of the road. The men abducted Karla and threatened to kill him if he contacted the police. The interview ended when medical personnel came to take Rivas for a CT scan. Rivas told the detectives to "come back."

The next afternoon, on March 18, detectives returned to the hospital and began a nearly six-hour question-and-answer session. The detectives had Rivas read

1

aloud each of his Miranda rights and then asked him if he understood those rights. He answered in the affirmative but repeatedly queried the detectives about his right to an attorney. He began by stating, "Ah a lawyer, I need time to find a lawyer. I need to see how much they charge." Over the next thirty minutes, the detectives engaged Rivas in casual conversation. Afterwards, Rivas raised the subject of getting a lawyer again, asking "Do you think that I need a lawyer? Because how you say innocent?" The detectives told Rivas that he had to decide that issue for himself. Rivas stated, "In the beginning, I say I don't want a lawyer, and then I want a lawyer so." Rivas later asked the detectives "if you know some lawyer."

The trial court ultimately found that Rivas's statements about his desire to secure counsel were "objectively unclear and ambiguous," and therefore the detectives had the duty either to clarify the ambiguity or cease questioning. The detectives, however, did not attempt any further clarification. No one contests in this appeal that the questioning of Rivas should have stopped at this point. But the interrogation continued for roughly another five hours.

During the continued interrogation, Rivas ultimately confessed to killing Karla, admitting that he punched her and struck her over the head with a meat tenderizer. He stated that he stuffed her body into a suitcase and drove to a vacant home, where he abandoned Karla's body. The interrogation continued until the detectives prepared to leave to look for Karla's body, at which point Rivas repeatedly said that he wanted to speak with the three detectives the next day. Rivas also asked about his cell phone and noted that he was not sure what was going on with the funeral.

The next day, March 19, Rivas was discharged from the hospital and transported by police officers to the Union County Prosecutor's Office, where he gave a videotaped statement. Rivas was read his Miranda rights and informed that his family was prepared to retain an attorney to represent him. Despite that information, Rivas waived his rights and indicated his willingness to speak with the detectives. Rivas then essentially repeated the confession he gave the previous day with added details. Rivas also gave a second statement acknowledging that he, that day, had voluntarily assisted detectives in locating evidence of the crime.

The trial court suppressed the March 18 statement but found the March 19 statements admissible. They were presented to the jury, and the jury later requested that a portion of the March 19 confession be replayed. The jury acquitted Rivas of murder but convicted him of the lesser-included offense of aggravated manslaughter and all the other charges in the indictment. On appeal, the Appellate Division upheld the denial of Rivas's motion to suppress his March 19 statements. The Court granted certification. 248 N.J. 489 (2021).

2

**HELD:**     *Once Rivas invoked his right to counsel on March 18, however ambiguously, the detectives were required to clarify the ambiguity or cease questioning. The detectives did neither. Instead, the detectives interrogated Rivas for nearly six hours, eliciting a confession. After the improper interrogation and Rivas's tainted confession -- a confession Rivas had reason to believe was lawful -- Rivas asked to see the detectives again. Those remarks cannot be fairly characterized as Rivas voluntarily initiating further communications with the detectives because the questioning never truly ceased. The interrogation and the request to speak again with the detectives were inextricably intertwined.

*Because Rivas never freely initiated further conversations with the detectives, further questioning of defendant was barred. That Rivas waived his Miranda rights on March 19 -- a day later -- does not alter the equation. A violation under Edwards v. Arizona, 451 U.S. 477 (1981), is not subject to an attenuation analysis. Therefore, Rivas's March 19 statements must be suppressed.

*Rivas's March 19 confession to killing his wife -- a mirror image of his March 18 confession -- was a central pillar of the State's case. The improper admission of that confession had the clear capacity to cause an unjust result and cannot be deemed harmless error. See R. 2:10-2. The Court is therefore constrained to vacate Rivas's convictions and remand for a new trial.

1. In Miranda v. Arizona, the United States Supreme Court mandated that the police advise suspects subject to custodial interrogation that they possess certain fundamental rights, including the right to an attorney -- even an appointed attorney if they were unable to afford one. 384 U.S. 436, 479 (1966). Miranda further directed that if a suspect requests an "attorney, the interrogation must cease until an attorney is present." Id. at 474. Under the New Jersey state law privilege against self-incrimination, a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel. Thus, if a suspect's words amount to even an ambiguous request for counsel, the questioning must cease, unless the officer makes additional neutral inquiries that clarify that the suspect desires to waive the presence of counsel. (pp. 27-28)

2. In Edwards, the United States Supreme Court held that if "an accused has invoked his right to have counsel present during custodial interrogation," the questioning must cease and cannot resume "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. Edwards set forth a bright-line rule that all questioning must cease after an accused requests counsel, and when law enforcement officers violate the dictates of Edwards, suppression is mandated. A violation of the Edwards command is not subject to an attenuation analysis. The

3

Court reviews relevant cases, which have held that when law enforcement officers do not honor a suspect's invocation of his rights and proceed with an interrogation, a suspect does not "reinitiate" discussions when the suspect's comments are made during the course of an ongoing interrogation. (pp. 28-33)

3. Under the Edwards jurisprudence, the interrogation never ceased after Rivas's equivocal invocation of the right to counsel; Rivas remained under the sway of an unlawful interrogation and tainted confession, and therefore it would be a fiction to say that Rivas reinitiated communications. There was no break in the interrogation before Rivas expressed his wish to see the three detectives again the next day. It is far from clear why, after making a full confession, Rivas requested to see the detectives again when they announced that they were leaving the hospital. Certainly, one reason appears to be a desire to take care of personal affairs -- Rivas earlier requested assistance in having his daughter placed with his family and having his property distributed to her. He also asked about obtaining his cell phone and said that he did not know what was happening with Karla's funeral. Under state law, however, a suspect only reinitiates a discussion with police under Edwards when it is a discussion of the crimes for which he was being held. Rivas's so-called statements "reinitiating" conversations with the detectives were prompted by the detectives' continued impermissible interrogation. In light of the Edwards violation and in the absence of Rivas voluntarily initiating further communications with the detectives, the March 19 statements must be suppressed. The full-throated Miranda warnings and waiver of rights on March 19 cannot resuscitate the confession on that day -- a confession that largely mimicked the suppressed confession of the previous day. Had the detectives honored Rivas's right to counsel by ceasing the interrogation, and had, at any point, Rivas initiated communications on the subject of the crime with the detectives, Edwards would not have barred the interrogation. (pp. 33-38)

4. Rivas's confession was one of the central pillars of the prosecution's case, and inculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment. Because the admission of Rivas's confession had the clear capacity to cause an unjust result, the Court is constrained to reverse his conviction and remand for a new trial. (pp. 38-39)

**REVERSED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS; and JUDGE FUENTES (temporarily assigned) join in JUSTICE ALBIN's opinion.**

4

SUPREME COURT OF NEW JERSEY

A-15 September Term 2021

086051

State of New Jersey,

Plaintiff-Respondent,

v.

Abayuba Rivas,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| March 14, 2022 | June 22, 2022 |

James K. Smith, Jr., Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; James K. Smith, Jr., of counsel and
on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued
the cause for respondent (Matthew J. Platkin, Acting
Attorney General, attorney; Regina M. Oberholzer, of
counsel and on the briefs).

Jason J. LeBoeuf argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Zeigler, Resnick & Epstein and the Law Offices of
Robert J. De Groot, attorneys; Jason J. LeBoeuf and Oleg
Nekritin, of counsel and on the brief).

1

The right to counsel holds a high preferred place in our constitutional scheme because the presence of counsel is an essential safeguard to the exercise of many other valued rights.  See Johnson v. Zerbst, 304 U.S. 458, 462-63 (1938); Powell v. Alabama, 287 U.S. 45, 68-69 (1932).  When a suspect invokes the right to counsel during a custodial interrogation, questioning must cease unless the accused initiates further communication or conversation, counsel is made available, or a sufficient break in custody occurs.  Maryland v. Shatzer, 559 U.S. 98, 104-09 (2010); State v. Wint, 236 N.J. 174, 181-82 (2018); see also Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

The issue in this case is whether defendant Abayuba Rivas freely initiated further communications with the police immediately on the heels of a nearly six-hour unlawful interrogation that led to a full confession.

Rivas reported to the police that his wife went missing and soon came under suspicion when his explanations about her disappearance began to fall apart.  After telling the police, during one of his interviews, that he left his two-year-old daughter at home alone while searching for his wife, he was

charged with child endangerment. While in jail, Rivas attempted suicide and was thereafter hospitalized and placed under police guard.

In the hospital, on March 18, 2014, three detectives interrogated Rivas for almost six hours, during which Rivas confessed to killing his wife. The next day, March 19, Rivas was interrogated in the prosecutor's office where, in two separate statements, he again admitted to the details of the killing.

At a pretrial hearing, the trial court found that the detectives violated Rivas's Miranda[1] rights because, at the outset of the March 18 interrogation, defendant ambiguously invoked his right to counsel and the detectives neither clarified whether Rivas wanted counsel nor ceased their questioning. Accordingly, the court suppressed the entirety of Rivas's March 18 confession.

The court, however, denied Rivas's motion to suppress the March 19 statements. The court found that, at the end of the nearly six-hour suppressed March 18 interrogation, Rivas stated to the detectives that he wanted to speak with them again, and that on March 19, Rivas properly waived his Miranda rights. On that basis, the court determined that Rivas's March 19 statements were sufficiently attenuated from the unlawfully secured March 18 confession. The March 19 statements were admitted into evidence, and a jury convicted Rivas of aggravated manslaughter and related crimes.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

3

The Appellate Division deferred to the trial court's Miranda rulings and affirmed Rivas's conviction.

We now reverse. The trial court's finding that Rivas's Miranda rights were violated on March 18, and its order suppressing Rivas's confession elicited on that date, are not challenged. The only question is the admissibility of the March 19 confession.

Once Rivas invoked his right to counsel on March 18, however ambiguously, the detectives were required to clarify the ambiguity or cease questioning. See State v. Alston, 204 N.J. 614, 624 (2011). The detectives did neither. Instead, the detectives interrogated Rivas for nearly six hours, eliciting a confession. After the improper interrogation and Rivas's tainted confession -- a confession Rivas had reason to believe was lawful -- Rivas asked to see the detectives again. Those remarks cannot be fairly characterized as Rivas voluntarily initiating further communications with the detectives because the questioning never truly ceased. The interrogation and the request to speak again with the detectives were inextricably intertwined.

Under Edwards, because Rivas never freely initiated further conversations with the detectives, further questioning of defendant was barred. That Rivas waived his Miranda rights on March 19 -- a day later -- does not alter the equation. An Edwards violation is not subject to an attenuation

4

analysis.  Therefore, in compliance with our constitutional jurisprudence, Rivas's March 19 statements must be suppressed.

Rivas's March 19 confession to killing his wife -- a mirror image of his March 18 confession -- was a central pillar of the State's case.  The improper admission of that confession had the clear capacity to cause an unjust result and cannot be deemed harmless error.  See R. 2:10-2.  We are therefore constrained to vacate Rivas's convictions and remand for a new trial.

## I.

## A.

A Union County grand jury indicted Rivas for the first-degree murder of his wife, Karla Villagra Garzon, N.J.S.A. 2C:11-3(a)(1), (2); second-degree endangering the welfare of a child, his two-year-old daughter, Veronica,[2] N.J.S.A. 2C:24-4(a); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); second-degree desecration of human remains, N.J.S.A. 2C:22-1(a)(1); third-degree hindering his own apprehension by concealing or destroying evidence, N.J.S.A. 2C:29-3(b)(1); and two counts of third-degree

---

[2]  We use the pseudonym Veronica to preserve the daughter's privacy.  See N.J.S.A. 2A:82-46(a).

hindering his own apprehension by giving false information to a law enforcement officer, N.J.S.A. 2C:29-3(b)(4).

Rivas moved to suppress statements that he gave to the police on seven separate dates: February 25, February 27, March 5, March 13, March 17, March 18, and March 19, 2014. The trial court conducted a suppression hearing that spanned five days and ultimately ruled that all but the March 18 statement would be admissible. In this appeal, Rivas challenges only the admission of his incriminating statements made on March 19.

In determining the admissibility of the March 19 statements, we turn to the relevant suppression hearing testimony, which is largely undisputed, and to the recorded statements made by Rivas on March 18 and 19. Most of the critical testimony was provided by Detectives Juan Guzman, Louchan Holmes, and Raymond Smith of the Elizabeth Police Department, and Detective Danika Ramos of the Union County Prosecutor's Office.

B.

Testimony at the Suppression Hearing

At 10:00 a.m. on February 24, 2014, Rivas went to the Elizabeth Police Department and reported that his wife Karla Villagra Garzon was missing -- that she never returned from a trip to the pharmacy the previous evening. Several police agencies, but primarily the Elizabeth Police Department,

6

investigated Karla's disappearance. Over the next several days, Rivas gave statements to the police to assist in the missing-persons investigation. He explained that at 10:00 p.m. on February 23, Karla left their apartment to walk to the pharmacy to buy sinus medication while he remained home with their two-year-old daughter.

Karla, however, did not appear on any store video footage that evening. When Detective Holmes visited Rivas's apartment, she noticed boots and a jacket matching the description that Rivas gave of the clothing Karla was wearing when she supposedly set out for the pharmacy.

On February 27, Rivas gave a videotaped statement to Detectives Holmes and Guzman. Rivas told the detectives that he and Karla had experienced marital problems and had discussed getting divorced, and that Karla had filed a domestic-violence complaint against him. He also disclosed that they had an argument the night Karla disappeared. Over the coming days, the police secured surveillance footage showing that the truck registered to Rivas was traveling on the streets of Elizabeth in the early morning hours of February 24, when Karla went missing.

On March 13, detectives questioned Rivas at the Union County Child Advocacy Center and, at first, he continued to insist that he remained home on the evening that Karla went missing -- until he was shown the surveillance

7

footage. Then, Rivas stated that he had left his daughter home alone for an hour or two while he drove around looking for Karla, who, he thought, may have had a liaison with someone. At the end of the questioning, Rivas was arrested and incarcerated for child endangerment and providing false information to the police.

On March 17, after a self-inflicted wound to his scrotum in a suicide attempt while held in jail, Rivas was taken to a local hospital, where he received two rounds of blood transfusions. That evening, Detectives Guzman and Smith visited Rivas in the hospital, where two officers stood guard. After reading Rivas his Miranda rights, the detectives questioned him, and Rivas soon departed from his earlier account. According to Rivas, he and Karla had gone to the pharmacy together, leaving their daughter alone, and were carjacked by several men. Rivas claimed that under coercion, he drove his vehicle until ordered to pull to the side of the road. The men abducted Karla and threatened to kill him if he contacted the police.

The interview ended when medical personnel came to take Rivas for a CT scan. Rivas told the detectives to "come back."

1.

## March 18 Statement

a.

The next afternoon, on March 18, Sergeant Larry Smith and Detectives Juan Guzman and Raymond Smith returned to the hospital and confirmed with the medical staff that they could speak with Rivas, who was still under guard in a room in the emergency department. The detectives began a nearly six-hour question-and-answer session, beginning at approximately 3:15 p.m. with Detective Smith recording the interrogation on his phone. The interrogation was conducted in both English and Spanish, with Detective Guzman translating as necessary.

The detectives had Rivas read aloud each of his Miranda rights and then asked him if he understood those rights. He answered in the affirmative but repeatedly queried the detectives about his right to an attorney. He began by stating, "Ah a lawyer, I need time to find a lawyer. I need to see how much they charge." The detectives then attempted to explain that if he could not afford an attorney, he would be assigned a public defender. Rivas replied, "That's not gonna help me." The detectives told Rivas that the attorneys in the Public Defender's Officer were "good lawyers" and "always on your side," but Rivas responded, "No, no, no." The detectives advised him that he could

9

exercise his rights at any time. But, when asked if he understood that point, he stated, "It's a little confuse."

Over the next thirty minutes, the detectives engaged Rivas in casual conversation. Afterwards, Rivas raised the subject of getting a lawyer again, asking "Do you think that I need a lawyer? Because how you say innocent?" The detectives told Rivas that he had to decide that issue for himself. Rivas replied, "if I decide something that is not convenient I can ah . . . F*** up my life," to which Detective Smith responded, "You can always change your mind."[3] Rivas added, "In the beginning, I say I don't want a lawyer, and then I want a lawyer so." The dialogue went back and forth on the subject, and ended with following exchange:

> [Rivas]: The lawyer, if you know some lawyer.
>
> [Det. Smith]: We're not allowed to do that, we're not allowed to tell you that.
>
> [Rivas]: . . . . Where can I find from the State? I don't know where, if I'm here and then I go to the jail again.
>
> [Det. Smith]: . . . you can google, you can.
>
> [Rivas]: Google where? My cell phone is with you.
>
> [Det. Smith]: They're going . . .

---

[3] Rivas spoke either in English or Spanish or a blend of both. The record before us contains English translations of Rivas's Spanish statements.

[Rivas]: Maybe people from Uruguay call my cell phone, right?

[Det. Smith]: I think they're gonna give that back to you. Ha?

[Rivas]: Many people could call my cell phone from Uruguay, right? I think so, yeah because never answer, the text messages people use to send me and I use to call. For sure they call.

[Det. Smith]: Can we talk about what happened with [K]arla?

[Rivas]: Yeah.

The trial court ultimately found that Rivas's statements about his desire to secure counsel were "objectively unclear and ambiguous," and therefore the detectives had the duty either to clarify the ambiguity or cease questioning. The detectives, however, did not attempt any further clarification. No one contests in this appeal that the questioning of Rivas should have stopped at this point. But the interrogation continued for roughly another five hours.

b.

During the questioning, Rivas gave the detectives the following account. On the evening of February 23, he and Karla got into a heated argument over their personal finances. The argument escalated, with Karla threatening to expose Rivas as gay and a thief to his family. The argument then turned violent. When Rivas pointed his finger in Karla's face, she bit down on it. To

11

free his finger, Rivas struck Karla in the face, and her nose began to bleed. According to Rivas, they both calmed down. They then left their daughter alone in the apartment and went to the pharmacy to get Karla sinus medication and afterwards to move Rivas's work trailer. While in a church parking lot with the trailer, Rivas claimed they were abducted at gunpoint by armed men -- and, at this point, Rivas's narrative tracked his account given a day earlier to the detectives about how Karla went missing.

The detectives expressed disbelief about this story. They told Rivas that he had to tell "the truth" because Karla "deserves to have a funeral" and his daughter "deserve[s] to go somewhere with flowers when she gets older." They also offered comforting words, saying, "God forgives us when we make a mistake."

Rivas's account changed course, and he elaborated on what occurred at the apartment, ultimately confessing to killing Karla. He stated that Karla provoked him by biting, hitting, and shoving him -- and that he lost control. He admitted to punching Karla, pushing her against the kitchen sink, and striking her over the head with a meat tenderizer. She fell to the ground unconscious.

Believing that he had killed Karla, he then stuffed her body into a suitcase, placed it in the back of his truck, and drove to a vacant house in

12

Chatham, where he placed her body in the basement. He then discarded the suitcase on the side of Route 78 and Karla's personal belongings, such as her clothing, purse, and phone, in the garbage.

During the questioning, he stated, "I'm a murderer . . . . I defended myself and I hit her wrong, I hit her hard I overdid it and that's it." He later added, "I did something wrong . . . . That is why yesterday I wanted to kill myself."

After Rivas's confession, the detectives turned much of their attention to pinpointing the abandoned house where Rivas had left Karla's body. Rivas expressed to the detectives his desire that his daughter be placed with his family and that the detectives assist in that effort. He also asked that all of his property be given to his daughter and that his cell phone be returned to him.

The interrogation continued while medical personnel came in and out of the room, checking on Rivas's medical condition and his IV line. Rivas was suffering from low blood pressure due to the loss of blood from his suicide attempt.

In the fifth hour of the interrogation, one of the hospital's doctors entered the room to conduct a psychiatric evaluation, followed by another physician who conducted a physical evaluation. Detective Guzman and Sergeant Smith remained present in the room, with Guzman providing

13

translation occasionally. During the psychiatric evaluation, Rivas recounted the details of his violent and deadly confrontation with Karla and his suicide attempt, with Detective Guzman interjecting at times. When the second doctor entered the room and asked Rivas for yet another account of the events leading up to the attempted suicide, Sergeant Smith spared Rivas from repeating the gruesome facts. Sergeant Smith simply responded, "He had a big fight with his wife, he murdered his wife, he put her in a suitcase, and dropped her off in an abandoned house, and then he tried to commit suicide in our jail cell."

At the conclusion of the doctors' evaluations, around 9:00 p.m., Detective Smith told Rivas that he and his fellow detectives would be leaving to look for Karla's body. Rivas replied repeatedly that he wanted to speak with the three detectives the next day. Detective Smith stated that he would return that evening if Karla's body was not recovered and that the next day they would search for the suitcase and Karla's other personal effects.

Rivas told the detectives again "that I need to talk with all of you," emphasizing the following points:

> [Rivas]: Don't forget to talk about my cell phone.
>
> [Sgt. Smith]: Oh, it's ok, yeah.
>
> [Rivas]: I don't know what is going on since today to the funeral, I don't know yet.
>
> [Sgt. Smith]: Okay, neither, I can't tell you that either.

14

[Rivas]: Yeah, yeah but ah, that's why I wanna talk with all of you and ah.

[(emphases added.)]

2.

March 19 Statements

The next day, March 19, Rivas was discharged from the hospital draped in a hospital gown and transported by police officers to the Union County Prosecutor's Office, where he gave a videotaped statement to Detectives Guzman and Smith. Rivas was read his Miranda rights and informed by Detective Guzman that a person from the Uruguayan Consulate had related to the Elizabeth Police Department that Rivas's family was prepared to retain an attorney to represent him. Despite that information, Rivas waived his rights and indicated his willingness to speak with the detectives.

Detective Smith opened the interrogation by stating, "[A]s we were leaving [yesterday] you said that you wanted us to come back and talk to you again," and shortly afterwards added, "Here we are." Detective Smith also told Rivas that Karla's body had been found on March 18. During the interrogation, Rivas essentially repeated the confession he gave the previous day with additional details. For example, Rivas explained that after he struck Karla fatally, he removed her clothes, placed duct tape over her eyes and

15

mouth, taped her arms behind her back, and put her in the suitcase. At the abandoned Chatham house, he placed Karla's body on a mattress and covered her with a blanket.

After giving the videotaped statement, Rivas accompanied Detective Danika Ramos and Sergeant Jorge Jimenez of the Union County Prosecutor's Office to a section of Route 78 where the suitcase was recovered. Rivas was returned to the Prosecutor's Office where he was Mirandized again and provided a videotaped statement acknowledging that he voluntarily assisted the detectives in finding the suitcase.

### 3.

### Ruling on the Suppression Motion

The trial court granted Rivas's motion to suppress the March 18 statement but not the March 19 statements. As earlier indicated, the court found that on March 18, Rivas made equivocal requests for counsel, which required the detectives to seek clarification or cease questioning, citing State v. McCloskey, 90 N.J. 18, 26 n.1 (1982). Because the detectives did neither, and failed to honor Rivas's right to counsel, the court suppressed the entirety of the March 18 statement.

In addressing the admissibility of the March 19 statements, the court acknowledged that, under Edwards, the detectives could not resume

16

questioning Rivas unless "counsel [was] made available to him" or Rivas "initiate[d] further communication, exchanges or conversations with the police," quoting 451 U.S. at 484-85. The court found, however, that "after the initial tainted statement," that is, "at the end of the March 18 interview, Mr. Rivas repeatedly beseeched the officers to return to talk to him again the next day," thus satisfying Edwards and allowing the detectives to initiate further communications with Rivas on March 19.

The court, moreover, determined that the March 19 confession was admissible because it was sufficiently attenuated from the "tainted" and suppressed March 18 confession. Applying the attenuation analysis, as set forth in State v. Hartley, 103 N.J. 252 (1986), the court found the following factors decisive: the time that elapsed (twenty hours) between the tainted confession and the subsequent confession; the change in location of the interviews, from the hospital to the prosecutor's office; the complete provision of Miranda rights on March 19; the March 18 request by Rivas to speak again with the detectives; "the minimal if any discernible effect of [Rivas's] prior confession on the March 19 disclosure"; and "the absence of any police misconduct." Last, the court concluded the present facts did not fit the "'cat out of the bag' scenarios" wherein a suspect confesses a second time because

he already confessed to the same crime, citing <u>Darwin v. Connecticut</u>, 391 U.S. 346, 350 (1968).[4]

C.

Rivas was tried before a jury in June and July of 2018. During the trial, Detectives Holmes, Smith, and Ramos all provided testimony similar to their accounts at the suppression hearing, detailing the varied and changing statements Rivas gave about Karla's disappearance.[5]

The jury also learned the following. Forensic DNA testing determined that the blood stain on a "thermal shirt" taken from Rivas's room in his home was Karla's blood. A retired Lieutenant from the K-9 unit of the Bergen County Sheriff's Department testified that he assisted the Elizabeth Police Department in searching Rivas's home and that his cadaver dog identified traces of human remains on a pair of boots in Rivas's bedroom and in Rivas's truck.

---

[4] The trial court denied Rivas's motion to suppress evidence related to the discovery of Karla's body. The court reasoned that, despite the suppression of the March 18 statement, Karla's body would have inevitably been discovered, either through the information divulged in Rivas's March 19 statement or by the Chatham home's owner or former tenant, who periodically visited the premises. On appeal, Rivas "concede[d] that Karla's body would inevitably have been found."

[5] Detective Guzman did not testify at trial.

18

Rivas's March 19 videotaped confession detailing his violent struggle with Karla, as well as how he killed her and disposed of her body, was perhaps the most critical piece of evidence admitted at trial. The jury also learned that Rivas assisted law enforcement in finding the suitcase in which he had stuffed Karla's body.

Rivas's admission to duct taping Karla's mouth and nose after she collapsed from the beating to her head took on special significance in relation to the autopsy performed by Dr. Junaid Shaikh, the Union County Medical Examiner. Dr. Shaikh determined that the primary cause of Karla's death was "asphyxia due to suffocation" from the duct taping and the placing of a plastic bag over Karla's head. Simply stated, Dr. Shaikh testified that "smothering [was] the cause of death." Dr. Shaikh also found that blunt force trauma to Karla's head was a contributing cause of death.

In his own defense, Rivas testified to the following account. At approximately 10:30 p.m. on the night of February 23, 2014, he was transporting items from his apartment to his truck, which was parked in front of the building where he lived with Karla and his daughter. As he was entering the apartment building, Karla's former boyfriend and another man grabbed him from behind and forced their way into his apartment. Karla apparently recognized one of the assailants, saying, "Jose, no, for my daughter

19

[Veronica]." The two men bound Rivas's and Karla's hands behind their backs, gagged them, and tied Karla to a chair. The men demanded money and jewels, and Rivas gave them $8,500 in cash and Karla's jewelry box. Afterwards, the men tied Rivas to a chair.

According to Rivas, the men attempted to take Karla with them, but when she forcibly resisted, they beat her over her head with a meat tenderizer, tied a plastic bag over head, stripped her naked, and left her body lying on the floor. Later, they stuffed her body into a suitcase, forced Rivas into his truck at gunpoint, and had him drive them along with the suitcase to a house in Chatham, where they placed Karla's body on a mattress in the basement.

The two men then put Rivas in the back of the truck and drove for roughly five minutes to a place where they met two other people in a separate vehicle. Rivas's two assailants placed him against his truck and told him his "days were numbered." They stated that he should leave the country with his daughter and threatened to kill him if he went to the police. The assailants left the scene in the other vehicle.

Later, when Rivas realized that the suitcase was still in his truck, he disposed of it on the side of Route 78. Upon returning to his apartment, he cleaned up the pool of Karla's blood in the kitchen, showered, checked on Veronica, and later made his report to the police.

In summation, the prosecutor pointed the jury toward Rivas's incriminating statements, emphasizing that Karla died from "[s]mothering or suffocation" and that Rivas admitted "what he did to Karla [in] the . . . March 19 confession." The prosecutor referred to Rivas's testimony as "utterly ridiculous."

During its deliberations, the jury sent a note to the court asking "to see the portion of the [March 19 statement] with Detective Smith where Mr. Rivas confesses to the crime and the circumstances of that evening." The court replayed that portion of the March 19 videotaped statement requested by the jury.

## D.

The jury acquitted Rivas of murder but convicted him of the lesser-included offense of first-degree aggravated manslaughter and all the other charges in the indictment. The court sentenced Rivas to a twenty-five-year term of imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and to a consecutive flat term of seven years for endangering the welfare of a child. All other sentences were made to run concurrently except that the possession of a weapon charge was merged with the charge of possession of a weapon for an unlawful purpose.

Rivas appealed his conviction, challenging the admissibility of his two March 19 statements.

## E.

In an unpublished opinion, the Appellate Division upheld the denial of Rivas's motion to suppress the March 19 statements, substantially for the reasons given by the trial court. The appellate court found that the record supported the trial court's "determination that at the end of the March 18 statement that was suppressed due to defendant's invocation of his right to counsel, defendant unequivocally stated he wanted to talk again." Accordingly, the Appellate Division held that, because Rivas reinitiated communications, the detectives did not violate Edwards by interrogating him the next day. It acknowledged that, absent the reinitiating of communications with the detectives, "an Edwards violation could not be subject to an attenuation analysis," citing Wint, 236 N.J. at 206.

Because the Appellate Division determined that Rivas had reinitiated communications, it held that an attenuation analysis was appropriate to assess whether the March 19 statements were "the product of the illegally obtained [March 18] statement" under the "fruit of the poisonous tree" doctrine, citing Hartley, 103 N.J. at 282. It affirmed the trial court's attenuation analysis,

22

which concluded that the March 19 statements should not be suppressed. Rivas's conviction was therefore affirmed.

We granted Rivas's petition for certification. 248 N.J. 489 (2021). We also granted the motion of the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amicus curiae.

## II.

## A.

Rivas argues that his March 19 statements should have been suppressed. Rivas submits that once he invoked his right to counsel on March 18, however ambiguously, further interrogation could not resume the next day under Edwards unless he "voluntarily" reinitiated conversations with law enforcement. Rivas contends that there was no break in the more than five hours of unlawful questioning on March 18 -- that he did not voluntarily reinitiate an interrogation that never stopped. He states that if he did not understand his right to counsel at the time he received his Miranda warnings, he did not better understand that right after a five-hour illicit interrogation; nor did he knowingly and intelligently waive that right when, on March 18, he asked to speak with the detectives the next day. Rivas stresses that an Edwards violation is not subject to an attenuation analysis, citing Wint, 236

23

N.J. at 206, and therefore his failure to voluntarily initiate further communications is fatal to the admissibility of the March 19 statements.

Last, Rivas notes that an attenuation analysis is not proper because "the detectives candidly testified that they wanted to speak to [Rivas] on March 19 to 'memorialize'" his March 18 statement.

Amicus ACDL emphasizes that but for the unlawful interrogation after Rivas invoked his right to counsel, the State would have no evidence that he reinitiated discussions about the case and that "the purported initiation occurred during the suppressed [March 18] statement." Amicus maintains that the eliciting of a tainted confession made it likely that he would succumb "to participate in a 'new' interrogation."[6]

B.

The State maintains that, based on the trial court's factfindings, which are entitled to deference, the detectives did not violate Edwards because Rivas reinitiated communication with them thirty minutes after the March 18 interrogation had stopped. The State also submits that Rivas's March 19

---

[6] The ACDL urges the Court to expand the Miranda warnings to include a requirement that suspects be advised "that their interests are best served by consulting with legal counsel prior to making a statement to law enforcement." It is not customary for the Court to address an issue raised only by an amicus for the first time on appeal -- an issue on which certification has not been granted. See Nicholas v. Mynster, 213 N.J. 463, 477 n.13 (2013). We do not do so here.

"statements are admissible because they are sufficiently attenuated . . . from the taint of the error that required suppression of the [March 18] statement."

The State notes that the trial court found that Rivas's "confessions were not the result of any coercion or improper tactic by the police." It stresses that only after Rivas had been informed of his <u>Miranda</u> rights and told that the Uruguayan Consulate had advised that his family was willing to retain an attorney for him did Rivas waive his rights, submit to an interrogation, and confess to his crimes. It also contends that Rivas had twenty hours between his March 18 and 19 statements to reconsider his expressed wish to speak again with the detectives.

Last, the State argues that even if the March 19 statements should have been suppressed, the admission of those statements was harmless error in light of the overall strength of the prosecution's case.

III.

A.

We begin with some familiar principles governing our scope of review in determining the admissibility of a defendant's statement given to law enforcement officers. We defer to the trial court's factual findings that are supported by sufficient credible evidence in the record and will not disturb those findings unless they are "so clearly mistaken that the interests of justice

25

demand intervention and correction."  State v. S.S., 229 N.J. 360, 374 (2017)

(quoting State v. Gamble, 218 N.J. 412, 425 (2014)).  We are not bound,

however, by a trial court's determination of the validity of the defendant's

waiver of constitutional rights or the voluntariness of a confession, which are

legal, not factual, questions.  State v. O.D.A.-C., ___ N.J. ___, ___ (slip op. at

22) (2022) ("[T]he ultimate issue of the voluntariness of a confession is a legal

question[.]"  (citing Miller v. Fenton, 474 U.S. 104, 110 (1985))); State v.

Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003).

## B.

The United States Constitution and New Jersey state law both guarantee

the right against self-incrimination.[7]  See U.S. Const. amend. V ("No person

. . . shall be compelled in any criminal case to be a witness against himself

. . . ."); N.J.S.A. 2A:84A-19 ("[E]very natural person has a right to refuse to

disclose in an action or to a police officer or other official any matter that will

incriminate him or expose him to a penalty or a forfeiture of his estate . . . .");

N.J.R.E. 503 (identical language to N.J.S.A. 2A:84A-19).  "New Jersey's

privilege against self-incrimination is so venerated and deeply rooted in this

state's common law" that we have regarded it "as though it were of

---

[7]  The Fifth Amendment right against self-incrimination has been made applicable to the States through the Fourteenth Amendment's Due Process Clause.  See Malloy v. Hogan, 378 U.S. 1, 8 (1964).

26

constitutional magnitude." State v. O'Neill, 193 N.J. 148, 176-77 (2007) (first citing State v. Reed, 133 N.J. 237, 250 (1993); and then citing State v. Muhammad, 182 N.J. 551, 568 (2005)). Indeed, we have found that our state law privilege "offers broader protection than its Fifth Amendment federal counterpart." Id. at 176-77 (citing Muhammad, 182 N.J. at 568).

In Miranda, "the United States Supreme Court imposed safeguards to . . . counteract the inherent psychological pressures that might compel a person subject to a custodial interrogation 'to speak where he would not otherwise do so freely.'" Wint, 236 N.J. at 193 (quoting Miranda v. Arizona, 384 U.S. 436, 467, 479 (1966)). The Court mandated that the police advise suspects subject to custodial interrogation that they possess certain fundamental rights, including the right to an attorney -- even an appointed attorney if they were unable to afford one. Miranda, 384 U.S. at 479. Miranda further directed that if a suspect requests an "attorney, the interrogation must cease until an attorney is present." Id. at 474.

Under our state law privilege against self-incrimination, "a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel." Alston, 204 N.J. at 622 (quoting Reed, 133 N.J. at 253). Thus, if a suspect's "words amount to even an ambiguous request for counsel, the questioning

27

must cease," unless the officer makes additional neutral inquiries that clarify that the suspect desires to waive the presence of counsel. See id. at 624. Under state law, at a Miranda hearing, the State must prove beyond a reasonable doubt that a suspect's waiver of rights "was knowing, intelligent, and voluntary." O'Neill, 193 N.J. at 168 n.12 (citing State v. Presha, 163 N.J. 304, 313 (2000)).

## C.

In Edwards v. Arizona, the United States Supreme Court held that if "an accused has invoked his right to have counsel present during custodial interrogation," the questioning must cease and cannot resume "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. The Court added that the prosecution cannot establish a valid waiver of the right to counsel "by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484.[8] Additionally, "officials may not reinitiate

---

[8] Shatzer carved out an exception to the Edwards rule for cases where "a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects." 559 U.S. at 109. Rivas remained in continuous custody from the time he was transferred to the hospital to the time he was transported to the Prosecutor's Office on March 19. Because there was no break in custody between the March 18 and March 19 statements, the Shatzer exception does not apply here.

28

interrogation without counsel present, whether or not the accused has consulted with his attorney." Minnick v. Mississippi, 498 U.S. 146, 153 (1990).

"Edwards set forth a 'bright-line rule' that all questioning must cease after an accused requests counsel." Smith v. Illinois, 469 U.S. 91, 98 (1984) (citing Solem v. Stumes, 465 U.S. 638, 646 (1984)). Without "such a bright-line prohibition," the Court reasoned, law enforcement officers "might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." Ibid. (citing Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983); Fare v. Michael C., 442 U.S. 707, 719 (1979)).

When law enforcement officers violate the dictates of Edwards, suppression is mandated of even "trustworthy and highly probative evidence," such as a "confession [that] might be voluntary under traditional Fifth Amendment analysis." Arizona v. Roberson, 486 U.S. 675, 681-82 (1988) (quoting Fare, 442 U.S. at 718). In other words, if law enforcement officers "initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect

executes a waiver" of his rights.  McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).

"The Edwards rule thus serves the purpose of providing 'clear and unequivocal' guidelines to the law enforcement profession."  Roberson, 486 U.S. at 682.  A violation of the Edwards command is not "subject to an attenuation analysis."  See Wint, 236 N.J. at 206 (citing Roberson, 486 U.S. at 681-82; Minnick, 498 U.S. at 159).

D.

When police comply with Miranda and respect the suspect's invocation of the right to counsel, the focus is purely on whether the suspect initiated discussions with the police.  A different scenario, however, is presented when law enforcement officers do not honor a suspect's invocation of his rights and proceed with an interrogation.

In those circumstances, courts have held that a suspect does not "reinitiate" discussions when the suspect's comments are made during the course of an ongoing interrogation.  See, e.g., United States v. Rosenschein, 369 F. Supp. 3d 1147, 1157 (D.N.M. 2019) (suppressing the defendant's statement after finding that the defendant "could not 'reinitiate' communication with the [interrogating] agent because the agent never stopped the conversation in the first instance"); State v. Hickman, 410 P.3d 1102, 1107

(Or. Ct. App. 2017) (finding, under Oregon law, that after the defendant's at least equivocal invocation of his right to counsel, the defendant did not initiate discussion with his interrogator; instead, the "defendant's incriminating statements were prompted by [the detective's] continued impermissible interrogation"); Ferguson v. Commonwealth, 663 S.E.2d 505, 512-13 (Va. Ct. App. 2008) (holding that despite the defendant's invocation of the right to counsel, the improper interrogation never ceased and, for Edwards purposes, the twenty-minute "period of silence did not suffice as a 'break' in the interrogation" when the defendant resumed the discussion); People v. Bradshaw, 156 P.3d 452, 456-57, 459 (Colo. 2007) (holding that after the defendant invoked his right to counsel, the defendant "could not have initiated further communication because [the officer] never stopped the interrogation"); Blake v. State, 849 A.2d 410, 422 (Md. 2004) (finding that detectives engaged in an "unlawful interrogation" after the defendant requested counsel and that, under Edwards, the twenty-eight-minute delay "before [the defendant] asked if he could talk to the officers [was] insufficient to constitute a waiver of his right to" counsel); State v. Abadie, 612 So. 2d 1, 6 (La. 1993) ("[A] suspect cannot 'initiate' an on-going interrogation.").

The following case illustrates the point. In United States v. Gomez, the defendant was arrested by DEA agents on charges related to a drug

31

investigation and taken to a DEA office. 927 F.2d 1530, 1532-33 (11th Cir. 1991). After the defendant was advised of his rights, he "stated that he was unwilling to cooperate and requested an attorney." Id. at 1533. Immediately afterwards, a DEA agent told the defendant "that he faced anywhere from ten years to life in prison and that the only way he could receive a lighter sentence was by cooperating." Ibid. Minutes after the defendant was taken back to a holding cell, the defendant asked another agent "why he had been arrested." Ibid. The agent "replied that he had been arrested for possession of ten kilograms of cocaine." Ibid. The defendant then cooperated, was again advised of his rights, and confessed. Ibid.

The United States Court of Appeals for the Eleventh Circuit held that after the defendant requested counsel, that request should have been respected, and the DEA agent should not have engaged in talk about "possible sentencing and the benefits of cooperation" because that was "reasonably likely to illicit an incriminating response." Id. at 1538. The court found that, for Edwards purposes, the defendant did not initiate the interrogation with the agents. Id. at 1539. The Eleventh Circuit reasoned that "the 'initiation' must come prior to the further interrogation; initiation only becomes an issue if the agents follow Edwards and cease interrogation upon a request for counsel." Ibid. Because

32

the agents did not heed <u>Edwards</u>'s command, the defendant's confession was suppressed. <u>Ibid.</u>

IV.

A.

We do not question the trial court's factual findings. The trial court and the Appellate Division, however, did not focus on the voluntariness of Rivas's initiated discussions with the detectives at the close of their questioning. The voluntariness of Rivas's comments is a legal issue that we now consider de novo. <u>See</u> <u>O.D.A.-C.</u>, ___ N.J. at ___ (slip op. at 22); <u>Pillar</u>, 359 N.J. Super. at 268.

Based on the <u>Edwards</u> line of cases, we cannot conclude that, after Rivas invoked his right to counsel, and was subjected to a nearly six-hour unbroken interrogation in violation of our state law privilege against self-incrimination -- an interrogation that elicited a damning confession and Rivas's offer of cooperation to locate his wife's body -- Rivas freely and voluntarily reinitiated conversations with the Elizabeth detectives before they left the hospital on March 18, 2014. In short, under the <u>Edwards</u> jurisprudence, the interrogation never ceased after Rivas's equivocal invocation of the right to counsel; Rivas remained under the sway of an unlawful interrogation and tainted confession, and therefore it would be a fiction to say that Rivas reinitiated

33

communications.  Under those circumstances, the detectives had no lawful authority to interrogate Rivas on March 19, even though he was properly Mirandized and waived his rights.  See Edwards, 451 U.S. at 484-85; Roberson, 486 U.S. at 681-82.

A summary of the events leads us to this ineluctable determination.

B.

Many of the principal points underlying the trial court's findings at the Miranda hearing are not at issue:  (1) when Rivas was read his Miranda rights in the hospital room by the Elizabeth detectives, Rivas equivocally or ambiguously invoked his right to counsel; (2) in the absence of clarification from Rivas, the detectives were constitutionally barred from questioning Rivas; and (3) in violation of Miranda and Edwards, the detectives unlawfully interrogated Rivas for nearly six hours, eliciting from him a confession that he killed his wife and an offer of cooperation in finding her body.  The State does not challenge the court's suppression of Rivas's March 18 statement.  The issue is whether, at a point nearing the six-hour mark of the confession, Rivas freely and voluntarily initiated a desire to speak again with the detectives to give a repeat confession on March 19.

To be clear, there was no break in the interrogation before Rivas expressed his wish to see the three detectives again the next day.  Even when

34

two doctors separately entered Rivas's hospital room, one to conduct a psychiatric evaluation and the other to conduct a physical evaluation, the detectives were present, translating and interjecting comments. Both doctors had Rivas provide a narrative of the crime, and to save Rivas from repeating the account again to the second doctor, Sergeant Smith interjected, "He had a big fight with his wife, he murdered his wife, he put her in a suitcase."

It is far from clear why, after making a full confession, Rivas requested to see the three detectives again when they announced that they were leaving the hospital. Certainly, one reason appears to be a desire to take care of personal affairs. See State v. Chew, 150 N.J. 30, 64 (1997) (under state law, a suspect only reinitiates a discussion with police under Edwards when it is a "discussion of the crimes for which he was being held" (quoting State v. Fuller, 118 N.J. 75, 82 (1990))). During the interrogation, Rivas asked for the detectives' assistance in having his daughter placed with his family and his property distributed to her and in returning his cell phone to him. At the end of the suppressed March 18 interrogation, when Rivas is alleged to have reinitiated a discussion with the detectives -- a discussion the State offers as the justification for the March 19 interrogation -- Rivas mentioned personal matters again. While it is true that Rivas told the detectives, "I need to talk with all of you," he also made clear that he needed his cell phone. He stated,

35

"Don't forget to talk about my cell phone," and added, "I don't know what is going on," referencing Karla's funeral. The detectives also indicated to Rivas that they might have to speak with him again that evening if they did not find Karla's body.

It is impossible to disentangle the nearly six-hour unlawful, unbroken interrogation and suppressed confession from Rivas's request to see the detectives again, as they were leaving. Rivas's so-called statements "reinitiating" conversations with the detectives were "prompted by [the detectives'] continued impermissible interrogation." See Hickman, 410 P.3d at 1107. We cannot ignore the seemingly direct cause and effect relationship between the unlawful interrogation and Rivas's later request to have further discussions with the detectives.

In addition, as the trial court found, Rivas did not waive his right to counsel before the unlawful interrogation began. We cannot conclude that, in the wake of having a tainted confession elicited from him, Rivas voluntarily, knowingly, and intelligently waived his right to counsel -- without any additional clarification on that subject -- when he asked to see the detectives again. See O'Neill, 193 N.J. at 168 n.12 (citing Presha, 163 N.J. at 313). If Rivas was "confuse[d]" about his right to counsel before the interrogation, he

36

certainly was no better informed about that right by the end of the unlawful interrogation.

There is no artificial line separating the suppressed confession and the moments before the detectives left the hospital when Rivas expressed a desire to see them again. There was no break in time between the two; they were inextricably intertwined. But, even in cases where there was a twenty- to nearly thirty-minute delay or period of silence between the unlawful interrogation and a defendant allegedly initiating further communications with law enforcement officers, courts have held that the time differential did not constitute a break in the interrogation for Edwards purposes. See Ferguson, 663 S.E.2d at 513; Blake, 849 A.2d at 422.

At the moment Rivas made those inviting comments to the detectives, he did not know that his confession could not be used against him. He was not schooled in our Edwards jurisprudence. It would have been reasonable for him to believe that his fate was sealed after he confessed. The State did not establish that Rivas's statements requesting to see the detectives were the product of a free and unconstrained will. See Edwards, 451 U.S. at 486 n.9 (noting that even if a suspect reinitiates an interrogation with law enforcement, the waiver must also be "knowing and intelligent and found to be so under the totality of the circumstances").

37

We therefore hold that in light of the Edwards violation and in the absence of Rivas voluntarily initiating further communications with the detectives, the March 19 statements must be suppressed. That is because there is no attenuation remedy for an Edwards violation. See Wint, 236 N.J. at 206 (citing Roberson, 486 U.S. at 681-82; Minnick, 498 U.S. at 159). The full-throated Miranda warnings and waiver of rights on March 19 cannot resuscitate the confession on that day -- a confession that largely mimicked the suppressed confession of the previous day. Cf. Edwards, 451 U.S. at 484-85; Minnick, 498 U.S. at 150-51.

One last comment. To be sure, had the detectives honored Rivas's right to counsel by ceasing the interrogation, and had, at any point, Rivas initiated communications on the subject of the crime with the detectives, Edwards would not have barred the interrogation. See Edwards, 451 U.S. at 484-85; Chew, 150 N.J. at 64.

V.

We reject the State's argument that the admission of Rivas's March 19 detailed confession, which was played to the jury and replayed in part in response to a jury question, constitutes harmless error beyond a reasonable doubt. Rivas's confession was one of the central pillars of the prosecution's case. We recently expressed "that it is rare that an unconstitutionally secured

38

confession is deemed harmless beyond a reasonable doubt." State v. Carrion, 249 N.J. 253, 284 (2021). We recognize "that inculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment." Ibid. (quoting McCloskey, 90 N.J. at 31). Because the admission of Rivas's confession had "the clear capacity to cause an unjust result," we are constrained to reverse his conviction and remand for a new trial. See State v. Basil, 202 N.J. 570, 605 (2010) (citing R. 2:10-2).

## VI.

For the reasons expressed, we reverse the judgment of the Appellate Division and remand for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS; and JUDGE FUENTES (temporarily assigned) join in JUSTICE ALBIN's opinion.